UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CRIM. NO. 0:22-cr-00104 (PJS)

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S POSITION** |
| v. | ) | **REGARDING SENTENCING** |
| | ) | |
| GLEN ROBERT ANDERSON, | ) | |
| | ) | |
| Defendant. | ) | |

_____   )_____

Pursuant to LR 83.10 (e) of the Local Rules of this Court, Defendant, Glen Robert Anderson, ("Mr. Anderson") submits his position regarding sentencing in the above referenced matter.

**Objections/Additions to the Presentence Investigation Report:**

Defendant interposed a number of objections to the preliminary Presentence Investigation report. These objections have been resolved. There are no outstanding objections or additions to address.

**Motions for a Downward Departure and Variance:**

Simultaneous with the filing of this Position Paper, Mr. Anderson has filed a Motion for a Downward Departure and a Motion for a Variance below the Guidelines range of Life Imprisonment.

**Facts:**

Mr. Anderson was born on April 1, 1998, to Neal Anderson and Cheryl Edelstein.  When Mr. Anderson was in the third grade, his parents divorced.  His mother remarried Mitch Edelstein and to his knowledge, she is still married to him. Mr. Anderson has one half-brother, Spencer Edelstein, who is the son of Mr. and Mrs. Edelstein. However, Mr. Anderson has not seen his brother in over eight years due to having no contact with his mother or Mr. Edelstein. (PSR at p. 17.)

Mr. Anderson has a documented history of mental health problems dating back to 2006. (PSR at p. 21.) He was assessed for Autism Spectrum Disorder in December of 2011 and later diagnosed with Adjustment Disorder with Mixed Anxiety and Depression. (Id.)  Evaluators noted that Mr. Anderson struggled with "social anxiety and attention deficit hyperactivity disorder;" he was formally diagnosed with autism and a mood disorder. (Id.) This evaluation concluded that Mr. Anderson presented with a "complex diagnostic picture of mixed autistic and Asperger's traits with 'many environmental pressures which could lead to some of these symptoms as well.'"  (Id.) Two years later, Mr. Anderson was diagnosed with Aspberger's Disorder and Social Phobia at age 15.  (PSR at p. 21.)  As a result of his mental health problems, at school Mr. Anderson was given an Individualized Education Plan for Emotional Behavioral Disorders.  (PSR at p. 24)   Despite the accommodations under the plan, Mr. Anderson continued to struggle in school, both academically and socially. (Id.)

The underpinnings for Mr. Anderson's diagnosis can be clearly seen in the abuse and isolation that he endured at the hands of his mother during most of his formative years.  After the divorce between his parents, Mr. Anderson split his time between his parents. (PSR at p. 17.) The "split time arrangement" only lasted until his mother gained primary custody; this is where

2

Mr. Anderson's nightmare life began. (Id.) Mr. Anderson's father worked long hours to support him, so he was unable to effectively contest his ex-wife's play for custody. (PSR at p. 18.) After the court ordered that Mr. Anderson live primarily with his mother, she almost immediately betrayed him by neglecting him. (Id.) She did not talk to him, she showed him no affection, she was not engaged in his development in anyway; she did not assist him in developing his talents and skills as he was not exposed to any extracurricular activity. (Id.) His mother's worst betrayal was her active disdain and dislike of him; she oscillated between verbally abusing him and ignoring him. (Id.) During intermittent portions of his childhood, the only attention that his mother would show him was negative and hurtful. (Id.)  She withheld food while making him exercise and lift weights excessively during his developing years such that his growth was stunted. (Id.) She locked him in the basement often and his stepfather threw things at him and degraded him.  (PSR at p. 21.) Desperately seeking help, Mr. Anderson called 911 in hopes that he would be extricated from his hell, but to no avail, he remained with his mother for many torturous years. (PSR at p. 18.)

Mr. Anderson's deep pain related to his mother revolved around her isolation of him. (Id.) His mother kept him away from peers and as a result, he spent most of his time alone at home.   (Id.) His loneliness and longing for human connection caused him to turn to strangers he met on the Internet for relationships and support. (Id.) As a developing child, the more time that he spent online, the more socially inept Mr. Anderson found himself. (Id.) Without the safety of separation from "real time" interactions with people, Mr. Anderson struggled mightily with making and maintaining "real" friendships at school.  (PSR at p. 22.). He also found himself struggling to understand the nuances of in person communication; he often missed social cues,

was revered as backward and later bullied.   He was ostracized and his loneliness increased to unbearable levels.  (PSR at p. 26.)

His desperation caused Mr. Anderson to choose internet "friends" over his schoolmates and he descended in a downward spiral into a very very dark world.   With the foresight of a child, Mr. Anderson had no understanding of the gravity of the life altering decision that he made.  Soon after deciding that the Internet served as his playground, adult male predators abused their friendship with Mr. Anderson and engaged in longstanding and intense grooming campaigns.  Many of these campaigns were fruitful for Mr. Anderson's abusers.  More than one adult male wormed their way into Mr. Anderson's life and facilitated in person visits where they raped him, some of those crimes occurring in public outdoor spaces, as the FBI discovered in the posted video of Mr. Anderson's exploitation.   Many of these males travelled across state lines to meet the child that hey cajoled and convinced was "special" and deserving of devotion, admiration, and attention.  (PSR at p. 6.)  Mr. Anderson aptly summed up his own victimization, that he was willing to trade sexual encounters for acceptance.  He told the psychosexual evaluator that as it related to him trading sexual pictures of himself with older men in their 40s and 50s when he was only 13 years, he articulated, "I got a kick out of doing it, if I did something they wanted, I felt valued." (Psychosexual evaluation at p. 5.)

Luckily for Mr. Anderson, in 2013, his father obtained custody of him.  He went to live with his father, and he never looked back. (PSR at p. 18.) He only maintained a connection with his mother so he could have contact with his younger brother, but even his limited interactions with his mother for that purpose were so toxic, that he had to cut ties with her and unfortunately, his little brother.  He has not had any contact with his mother and his brother since 2016.  (PSR at p. 22.)

Mr. Anderson continued to be an online target for sexual abuse because long into his adulthood, he continued to resemble a minor and given his emotionally stunted self-structured upbringing, he often behaved like an adolescent which only intrigued his abusers more as their fantasies of having sex with minors were sated without legal consequence.

Mr. Anderson ascended to "online fame" as a larger than life and notorious personality. He engaged in a "gaming forum," ("The Forum,") where later as a systems administrator, he regularly engaged with minors.  (PSR at. P. 4).  He did not simply play video games with the children he hosted; he formed relationships, friendships, and he even fell in love on more than one occasion with more than one minor. During the six years that Mr. Anderson was "adulting" in the gaming world, he remained confused about his sexual identity and remains so today. (Psychosexual Evaluation at p. 11.) He engaged in many same sex relationships.

Just as he had been taught, Mr. Anderson crossed state lines on more than occasion in an effort to have in person relations with minors that he was attracted to on-line through The Forum. Mr. Anderson was not as "successful" as his predators, but he remained hopeful that his connection to these minors would one day provide him with love, connection and sexual satisfaction.  (PSR at p. 5-11.)

Over time, his engagements with minors became well understood in certain gaming circles and to his chagrin, the once supportive environment that nurtured him from childhood to adulthood, became an inhospitable place where he had enemies who were seeking to expose his now nefarious grooming activities and sexual relationships with minors.  Eventually, several of Mr. Anderson's "online gamers" did contact the police and multiple reports were made that form the basis of the charges that Mr. Anderson faces today.  (PSR at p. 12)

Mr. Anderson candidly revealed the existence of these relationships, his very real love for some of the minors and his belief that he was set up by others. (Psychosexual Evaluation at p. 3) Mr. Anderson has never wavered that his actions were illegal and that he is responsible for the wrongs he alone committed.  (See Statement of Responsibility dated October 27, 2022)

Mr. Anderson's statement of responsibility demonstrates his remorse and willingness to change. He acknowledges that "none" of his victims "deserved what he did to them," and that "they all deserve justice and I hope that by my taking responsibility for my crimes and my wrongdoing that can be the start of their healing." (Statement of Responsibility of Glen Anderson dated October 27, 2022)

From 2013 until he was charged, he remained in residence with his father, and he agreed to be remanded to custody.  (PSR at p. 18)

In 2019, Mr. Anderson obtained his GED and shortly thereafter, he enlisted with the United States Air Force and completed basic training.   Shortly thereafter, Mr. Anderson was discharged.  Mr. Anderson laments that he did not appeal his discharge because he truly enjoyed military. (Id.) Following a heart attack that his father suffered, Mr. Anderson was depressed regarding his father's ailing physical health. (Id.) Mr. Anderson's close bond to his father caused a surge of empathy such that he could not function at his military post because he "felt like dying." (Id.)  The authorities interpreted his statement as a suicide threat and hie was hospitalized. (Id.) These feelings subsided while he was hospitalized but he was still discharged in 2020.  (Id.)

The investigation that began in 2020 regarding Mr. Anderson started with the FBI believing that he was a child victim. (PSR at p. 5)  He was a child victim and the FBI quickly learned that the video of his sexual molestation at the hands of an adult male that he met online

when he was just 16 years old was actually posted by Mr. Anderson himself. (Id.)  Mr. Anderson later explained that he posted the video because he believed his personal worth derived in how much pleasure he could give others.  Much more was uncovered about Mr. Anderson's victimization of minors, which is the basis of this case.  (PSR at p. 5-11)

Mr. Anderson has no other criminal history, other than this offense. He has a pending "companion case" in Anoka County, Criminal Sexual Conduct in the Third Degree (file number CR-22-4523) that relates to Count 3.  His intention is to plead guilty to that offense consistent with this plea agreement. His is currently represented by an Anoka County Public Defender.

On May 27, 2022, a four count Information was filed in the District of Minnesota charging Mr. Anderson with Count 1: Production and Attempted Production of Child Pornography from August 1, 2016 until in and around 2018 and 2019, in violation of 18 U.S.C. § 2251(a) and (e); Count 2: Enticement of a Minor from January 2018 until in and around January 2020, in violation of 18 U.S.C. § 2422(b); Count 3: Production and Attempted Production of Child Pornography from January 2018 until in and around January 2020, in violation of 18 U.S.C. § 2251(a), (e); and Count 4: Interstate Communication with Intent to Extort in and around May 2021, in violation 18 U.S.C. § 875(d). (PSR at p. 1). On June 28, 2022, Mr. Anderson appeared before The Honorable Chief U.S. District Judge Patrick Schiltz and pled guilty to all four counts as charged in the information. (Id.)

At the plea, PSR interview, and during his psychosexual evaluation, Mr. Anderson admitted all four counts and did not assert any defense. (PSR at 16 & Psychosexual evaluation.) Mr. Anderson was notably remorseful and voiced that he feels a great deal of shame and embarrassment. (PSR ¶ 15)

Mr. Anderson and the Government arrived at a plea agreement under which Mr. Anderson would plead guilty to the four counts set forth in the Information. Under the plea agreement, parties agree of the following base level offense for Count 1: base level offense is 32. (PSR at p. 1)  The parties also agree on the following adjustments: a 2-level increase for specific offense characteristic for the offense involving a minor who had attained the age of 12 but not attained the age of 16 years, a 2-level increase for an offense involved the commission of a sexual act or sexual contact, a 2-level increase for an offense involving the use of a computer or an interactive computer service to persuade, induce, entice, or coerce a minor to engage in sexually explicit conduct, a 2-level increase for willfully attempting to obstruct or impede the administration of justice. This adjusted offense level for Count 4 is 40. (PSR at p. 15)

Under the plea agreement, parties agree to the following base level offense for Count 4: base level offense is 9 and no specific offense characteristics apply. Count 1 embodies this conduct in the Chapter 3 adjustment for obstruction of justice and Count 1 results in the higher adjusted offense level. (PSR at p. 14)

Under the plea agreement, parties agree of the following base level offense for Count 2: base level offense is 28. (Id.) The parties also agree on the following adjustments: a 2-level increase for specific offense characteristic for the offense unduly influenced a minor to engage in prohibited sexual conduct, a 2-level increase for an offense involved the commission of a sexual act or sexual contact, and a 2-level increase for an offense involving the use of a computer or an interactive computer service to persuade, induce, entice, or coerce a minor to engage in sexually explicit conduct. This adjusted offense level for Count 2 is 34. (PSR at p. 15)

Under the plea agreement, parties agree of the following base level offense for Count 3: base level offense is 32. (PSR at p. 14)  The parties also agree on the following adjustments: a 2-

level increase for specific offense characteristic f for the offense involving a minor who had attained the age of 12 but not attained the age of 16 years a 2-level increase for an offense involved the commission of a sexual act or sexual contact, a 2-level increase because Mr. Anderson knowingly engaged in distribution of a video depicting JNK, by later distributing it to JNK, and a 2-level increase for an offense involving the use of a computer or an interactive computer service to persuade, induce, entice, or coerce a minor to engage in sexually explicit conduct. This adjusted offense level for Count 4 is 40. (PSR at p. 15)

The multiple count adjustment results in 2.5 units, creating a 3-level increase pursuant to USSG § 3D1.4. The Combined Adjusted Offense Level is determined by taking the offense level applicable for the highest offense level (Counts 1 and 4, adjusted level 40) and increasing the offense level by the amount indicated in the table at USSG § 3D1.4 (+3). This results in the combined adjusted offense level being 43. (PSR at p. 12-16)

Chapter Four Adjustment: because each victim qualifies as at least one occasion of a prohibited sexual conduct, the 5-level enhancement applies. (PSR at p. 15-16)

Mr. Anderson has accepted responsibility for the offense decreasing the offense by 2 levels.  Mr. Anderson assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of the intention to enter a plea of guilty decreasing the offense by 1-level. (PSR at p. 16)

The total offense level is 45, however, pursuant to Chapter 5, Part A (comment n.2), the offense level will be treated as a level 43. (Id.)

With a total offense level of 43 and a criminal history category I, the guidelines imprisonment range is life imprisonment. (PSR at p. 2.) The plea agreement has no impact on the guideline computations or resulting range. The Parties agreed in the plea agreement that Mr.

Anderson shall pay $15,000.00 in JTVA assessments and a $100,000.00 assessment under the AVAA. (PSR at p. 27)

Per the plea agreement, Mr. Anderson engaged in a psychosexual evaluation. The parties agreed to an evaluator at Alpha Emergence. The evaluator was provided with the following collateral information: Information and the PSR with the consent of the Court. The evaluator at Alpha Emergence conducted a four hour and 45-minute clinical interview with Mr. Anderson during which he was administered the following evaluations: Static-99R, Stable-2007, Minnesota Multiphasic Personality Inventory-2-Restructured Form (MMPI-2-RF), Millon Multiaxial Clinical Inventory-IV (MCMI-IV), and the Sexual Adjustment Inventory (SAI). (Psychosexual evaluation)

After reviewing all relevant case material and assessing Mr. Anderson by way of several actuarial tests, the psychosexual evaluator opined that Mr. Anderson's combined scores on the Static-99R and the Stable 2007 place him in the "Moderate High "nominal risk category to reoffend. (Psychosexual evaluation at p. 16.) That said, the psychosexual evaluator acknowledges that statistics for recidivism in this category are surprisingly quite low. (Id.) Men with the same risk profile as Mr. Anderson have been seen to recidivate sexually at 1.8% over one year, and 12.2% over five years. (Id.)

The psychosexual evaluator also identified a number of protective factors that serve to ensure Mr. Anderson's probable success in treatment. (Psychosexual evaluation at p. 18.) These protective factors include: an average level of intelligence, possessing current use of coping skills to manage stress, his motivation for treatment, his ability to envision future goals, and his positive attitude to authority figures. (Id.) Additionally, Mr. Anderson has a devoted and

supportive father and extended family are aware of his legal situation and who plan to support him even during his incarceration. (Psychosexual evaluation at p. 5, 18)

Also, per the plea agreement, Mr. Anderson completed a polygraph examination regarding his history of sexual offending.  He "passed" the polygraph by showing no deception when he endorsed his sexual offending.  (FBI Polygraph Results)

As argued below, Mr. Anderson respectfully requests that this Court depart downward from the Guidelines or alternatively determine that a variance is appropriate and sentence Mr. Anderson to the mandatory minimum.   These sentencing options are appropriate because of his complicated life history that led to his own victimization which formed the template for what he believed were "normal" intimate relationships.  Additionally, his psychosexual assessment and performance on the polygraph dictate that his rehabilitative needs can be met while he is in prison serving the minimum sentence.

**Argument:**

## I.   Mr. Anderson qualifies for a downward departure from the guideline sentence of life imprisonment pursuant to USSG §§ 5H1.1, 5H1.3, 5H1.4.

"Age (including youth), mental and emotional conditions, and physical condition or appearance, including physique, are relevant in determining whether a departure is warranted, if considerations based on age, emotional condition, or physical appearance, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."  USSG §§5H1.1, 5H1.3, 5H1.4.

This Court is well within its discretion and sound judgment to grant a downward departure based on these factors.  The Commission's language acknowledges the propriety of

considering these factors when, in the sentencing judge's view, they present an extraordinary situation. *United States v. Lara*, 905 F.2d 599, 603 (2d Cir. 1990.)  In *United States v. Lara*, the sentencing judge granted a downward departure to a co-defendant based on these very same factors.  In *Lara*, the court found that defendant's particular vulnerability due to his immature appearance, sexual orientation and fragility justified the departure consistent with the aforementioned sentencing guideline.

Mr. Anderson was first victimized and literally ostracized by his own mother at the tender age of eight; he has been a victim of sexual abuse since the age of 12, before he even reached puberty and long before he began to grapple with his sexuality.   Mr. Anderson's imposed isolation at the hands of his mother forced him to seek affection and attention from throngs of available and willing sexual predators on the Internet.   Mr. Anderson never learned about healthy relationships and sexuality, rather he was groomed and mentored by terribly sick individuals who sought nothing other than to molest him, feigning love and offering attention simply to achieve their own twisted goals.  It is quite easy to see Mr. Anderson's progression from victim to predator.  Investigating Probation Officer Heino clearly and succinctly identified that Mr. Anderson's "own victimization and his toxic, abusive, and extremely difficult upbringing, seemed to have normalize his behavior, as he had no parental oversight or intervention to this behavior."  (PSR at p. 18)  Mr. Anderson's vulnerability to victimization and his physical and emotional condition of immaturity warrants a downward departure.  These factors are so pronounced to an unusual degree that they mandate a downward departure from the guideline sentence of life imprisonment.

II.    **Mr. Anderson qualifies for the mandatory minimum 15-year sentence than the guideline sentence of life imprisonment because a variance is warranted pursuant to 18 U.S.C. 3553(a).**

      The United States Sentencing Guidelines are advisory, not mandatory. *U.S. v Booker,* 543 U.S. 220 (2005.)   As a matter of substance, the Court is only required to impose a sentence "sufficient, but not greater than necessary to comply with the deterrent, security, remediation, and retribution purposes underlying 18 U.S.C. §3553(a)(2)." Procedurally, the Court is also obligated to consider the factors articulated in 18 U.S.C. §3553 (a) when pronouncing a sentence. *U.S. v. Barron*, 557 F.3d 866, 868 (8th Cir. 2009.)

      The Supreme Court held in *Booker* that this mandatory system was inconsistent with the Sixth Amendment. *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005).  To bring the Guidelines in line with that amendment, the Court held that the entirety of 18 U.S.C. § 3553(b)(1)—the provision that required courts to "impose a sentence of the kind, and within the range" directed by the Guidelines—must be "severed and excised" from the Act. (Id.) at 245, 125 S.Ct. 738. The Court explained that the Act, as passed, created a mandatory Guidelines system, but that in light of its Sixth Amendment holding that choice was not open to Congress. (Id.) at 265, 125 S.Ct. 738. The Guidelines could stay, but by severing the "provision of the federal sentencing statute that makes the Guidelines mandatory," the Court established that they are "effectively advisory." (Id.) at 245, 125 S.Ct. 738. And in so doing, *Booker* restored much of the district courts' traditional sentencing discretion.

      Still, the Guidelines are not irrelevant. After *Booker*, a sentencing court must "consult those Guidelines and take them into account when sentencing"—what we have described as establishing the "procedural reasonableness" of a sentence—but the Guidelines are no longer the final consideration. (Id.) at 264, 125 S.Ct. 738; *See also United States v. Sarras*, 575 F.3d 1191,

1219 (11th Cir. 2009). Instead, a district court now has the freedom to "tailor the sentence in light of other statutory concerns," and a judge can choose an outside-Guidelines sentence so long as the judge has considered, and the sentence reflects, the factors outlined in § 3553(a): the nature and circumstances of the crime, the need for the sentence imposed, the kinds of sentences available, and the like. *Booker*, 543 U.S. at 245, 125 S.Ct. 738. So while many guidelines use the terms "must" or "shall," that language simply requires courts to properly consider them when deciding the advisory Guidelines recommendation—it does not render them mandatory when imposing the final sentence. *See Sarras*, 575 F.3d at 1209 n.22., *United States v. Henry*, 1 F.4th 1315, 1320–21 (11th Cir. 2021), *cert. denied,* 142 S. Ct. 814 (2022.)

This Court is not required, however, to consider any factor or combination of factors to be determinative in an individual case.  (Id.) 18 U.S.C. §3553(a) contains seven factors to be considered:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and the provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentences and sentencing range established by the Sentencing Commission for the applicable categories of offense and defendant;

(5) any applicable and pertinent policy statement issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. §3353 (a).

In the present case, a consideration of the factors set forth in 18 U.S.C. §3553(a) demonstrate that a Guidelines sentence of life imprisonment is unnecessarily harsh and not necessary to comply with the policy goals set forth in 18 U.S.C. §3553(a)(2).  As such, Mr. Anderson should be given a variance for a lesser sentence, specifically the mandatory minimum sentence of 15 years.

In *U.S. v. Freed*, 566 Fed. Appx. 162 (2014), the defendant was charged with two counts of Production of Child Pornography, in violation of 18 U.S.C. § 2251(a) and (e), two counts of Attempted Production of Child Pornography, in violation of 18 U.S.C. § 2251(a) and (e), two counts of Distribution and Receipt of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2), and one count of Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a) (4)(B). (Id.)  The defendant in *Freed* pled guilty to all seven counts on March 1, 2012; His total offense level was 44[1], and combined with a criminal history category of I, his advisory Guidelines range was life imprisonment.

Prior to sentencing, the defendant in *Freed* filed a sentencing memorandum requesting that the District Court sentence him to the mandatory minimum of 15 years imprisonment. (Id.) The district court provided a comprehensive analysis of the pertinent sentencing factors listed in 18 U.S.C. § 3553(a).  The court then acknowledged a number of mitigating factors including his amenability to treatment that warranted a substantial variance below the advisory Guidelines range of life imprisonment while also recognizing the heinous nature of the defendant's criminal conduct. (Id.)  Ultimately, the district court concluded that the defendant's conduct, which was undeniably described as "unimaginable, unforgettable, and without justification under any legal

---

[1] Mr. Anderson's total offense level is 43.

or moral code," (App. 270), only warranted a sentence of 20 years in prison and not life in prison because the mitigating factors were significant. (Id.)

The reviewing court found that the district court did not overlook any mitigating factor in Freed's background. It concluded that it was satisfied that the District Court gave meaningful consideration to each of the § 3553(a) factors. In fact, the District Court's thorough review of the evidence in arriving at its sentence was commendable and therefore was thus no procedural error committed when the court issued a variance.

### 1. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant Warrant a Variance.

Although the facts are different in the case at bar, there is valid application of the law as articulated in the *Freed* case.  In particular, Mr. Anderson's psychosexual evaluation and his "no deception" polygraph demonstrate his amenability to treatment and justify a variance.

Mr. Anderson remorsefully acknowledged his criminal behavior, accepting responsibility at the first possible opportunity following the inception of the investigation.  It is evident from his interviews that he may not fully understand how the events of his life unfolded to culminate to the sentencing in this case, but that does not in way diminish his heartfelt remorse and regret. Most notably, Mr. Anderson is aware of the intense irony that he morphed from child victim to child abuser.  Nonetheless, Mr. Anderson was very clear with every person who interviewed him in relation to this case that that his conduct was not only illegal, but that his actions will forever negatively impact the trajectory of the lives of his victims.  In many ways, it is clear that Mr. Anderson is ready to piece together the fragmented aspects of his life by organizing those pieces into a pathway for healing and rehabilitation.

16

As the Presentence Report indicates, during some of his most important developmental years, Mr. Anderson grew up in a very toxic and abusive family environment when he was living with his mother.  His isolation led to his victimization and his dysmorphic view of intimate relationships, familial bonds and friendships.  The only way Mr. Anderson knew how to engage was to offer his body in exchange for love, attention, and respect; he learned that his currency and value as a human was based upon how his body could sexually satisfy others.   In short, Mr. Anderson's view of the world and relationships was perversely skewed.  His mental health issues present a "chicken or the egg" question but no doubt complicated how Mr. Anderson processed his grief regarding his toxic relationship with his mother, the loss of his own innocence, his own stunted development and his profound loneliness and desire for real connection and belonging.

 Despite his tragic upbringing, there are several protective factors that weigh in favor of a variance.  First, Mr. Anderson has no prior criminal history.  Secondly, he made immediate offers to take responsibility and third, he voluntarily agreed to turn himself following his plea are all indicators that Mr. Anderson possesses the insight and commitment to follow court orders but more importantly engage in treatment to rehabilitate himself.

It is clear from his psychosexual assessment, that with treatment, Mr. Anderson is not likely to repeat his behavior.  Additionally, Mr. Anderson's protective factors outlined in the psychosexual evaluation support the conclusion that his likelihood to reoffend is less than the typical offender with similar offenses.  Mr. Anderson's protective factors should also be considered in conceptualizing his risk for recidivism. These factors include that Mr. Anderson possesses an average level of intelligence, employs coping skills to manage stress, is motivated to pursue treatment, possesses future goals, and exhibits positive attitudes towards those in authority.  Additionally, Mr. Anderson has a devoted and supportive father and extended family

that he can rely on to overcome difficult situations which also serves to minimize his risk to reoffend.

Already, we can see that from Mr. Anderson's candor when approaching the polygraph examination, that showed no deception, this Court should have confidence that Mr. Anderson earnestly wants to engage in treatment and has the skills to do so.

With appropriate correctional supervision, and Mr. Anderson's continued commitment and engagement in therapeutic techniques, it is quite plausible that Mr. Anderson's actual recidivism rate is diminished. These circumstances warrant imposition of the mandatory minimum 15-year sentence as opposed to a life term of imprisonment that is designated by the Guidelines.

2. **The need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to afford adequate deterrence to criminal conduct; and the need to protect the public from further criminal conduct warrant a variance.**

While Mr. Anderson's own extremely sad victimization by numerous adult men do not justify his crimes, it is not a common factor for others convicted of similar offenses as the Pre-Sentence Report discussed. (PSR at p. 31) Mr. Anderson was a victim for so long, that the mindset that minors are available for sexual gratification became a "normal" way of life, such that his victimization of other minors was not objectionable. Almost as if he was awakened from a trance, when confronted with the horror of the realities of his own victimization in adolescence, Mr. Anderson understood how he became a predator. During the course of the interviews conducted in this case, Mr. Anderson has bravely revisited his past to obtain insight into the impact his actions has had on others.

18

If Your Honor grants Mr. Anderson's request for a variance, his life will be indelibly altered following his release from prison after over a decade of serving time.  Every aspect will be different: no longer will his former internet comrades rally around him, his community will look and feel different, his parole terms will no doubt restrict his internet use and his relationships with not just minors, but anyone with influence.  His ability to work will be very hampered and he will have to rebuild from the ground floor. This "rebuilding" provides Mr. Anderson with a distinct opportunity to therapeutically reframe his life and put boundaries into place to avoid criminal and anti-social behavior. Mr. Anderson has never been given a chance to rehabilitate himself from the emotional scars of his childhood.  With proper interventions and supervision, there is little indication that Mr. Anderson will reoffend or violate the terms and conditions of his parole.  Mr. Anderson continues to vocalize his desire to seek treatment, therapy, and to change.  Mr. Anderson takes full responsibility for his role in the offense. In this respect, he has demonstrated psychologically that he has gained insight and clarity and that what he did was wrong, and this is an excellent starting point as he is no longer living in the dark shadows of his past.

3. **The need to provide the defendant with needed educational or vocational training, medical care, or other corrective treatment in the most effective manner.**

Mr. Anderson would have ample time with the 15-year mandatory minimum sentence to complete any corrective treatment, therapy, vocational, training, and education. This would allow him to address how his own trauma and victimization led him to his criminal offenses.

**Conclusion:**

This Court has ample reason to depart from the Guidelines because Mr. Anderson's age, his mental and emotional conditions, and physical condition or appearance, including physique. Mr. Anderson committed terrible offenses for which he accepted full responsibility. For all the reasons stated above, Mr. Anderson deserves a downward departure from the Guidelines and instead should be sentenced to the mandatory minimum sentence of 15 years.

Due consideration of the factors set forth in 18 U.S.C. §3553(a) warrants imposition of a variance and a sentence more lenient than would result from a mechanical application of the Sentencing Guidelines. A downward variance from the Guidelines is certainly in line with the mandate of 18 U.S.C. §3553(a)(2). Accordingly, Mr. Anderson alternatively and respectfully requests the Court grant a variance and sentence Mr. Anderson to the mandatory minimum of 15 years.

Respectfully submitted,

GROSHEK LAW

Dated this tenth day of January 2023.

/s/
Christa J. Groshek (#303331)
302 N. 10th Ave
Minneapolis, MN 55401
Tel (612) 827-3833
christa@grosheklaw.com

Attorney for Glen Anderson, Defendant.